Al-Farrakh. May it please the Court, I am Lawrence Mark Stern, and with me is Robert Boyle. We are here representing the appellant Mohannad Al-Farrakh. And the record will reflect that before coming into open court this morning, we had the opportunity to have an ex parte hearing in the roving room. And as part of that hearing, Mr. Stern and his colleague gave us the benefit of their views, all of this material being under seal until further order of the Court. Go ahead. Time permitting, Your Honors, and with your permission, I would like to address two core issues in the case, one of which is the clearly erroneous failure of the district court to consider the whole record on the issue of suggestive identification and its omission of salient facts that were adduced in that record of suggestive identification, and indeed, his consideration, according to his opinion, of matters outside the record which were not introduced during the Wade hearing, and two, the failure of the Court to apply to its preclusion of defense cross-examination of the fingerprint expert its own rule, which it invoked in favor of the prosecution, that when the jury would struggle enormously with its biases and preconceptions on a matter, it should be allowed to hear about other cases that address that bias and that preconception. The first of these issues is the one which, as I understand it, the Court will address in a closed session, so I will address the second one first, and then we'll take the break as I go. That first issue is about whether or not the Court balanced its rule, its own rule that it created in this case, and I'm using its words, when the jury would struggle enormously, quote, unquote, with its preconceptions about whether or not a clean-cut kid could become a terrorist, an issue which, as I understand it, wasn't even raised in the case, then the government would be allowed to bring in an expert to testify about other cases to tell the jury that, in fact, essentially a clean-cut kid could become a terrorist, and hence permitted the prosecution to bring in 30 people, 30 other terrorists, and he concluded that anybody essentially could be a terrorist. But when it came to the fingerprint request during the examination of the fingerprint expert for the prosecution, that the defense wanted to question the expert about the now-famous Mayfield incident and the report by the FBI, which involved the FBI's conclusion for many, many months that two people, two different people had the same fingerprint, when the defense asked to bring that report to the court, given the bias and the preconceptions that juries have that fingerprint evidence is infallible, that it's a science, that there's absolute certainty about it, notwithstanding that preconception and that bias and the fact that the jury would struggle enormously to overcome that, the court precluded admission of the Mayfield report or cross-examination of the fingerprint witness about the Mayfield report. Both situations, the Vidino testimony about his interviews with 30 terrorists and the Mayfield report, deal with another case and other cases, and this was the reason the court said it was precluding examination using the Mayfield report, that it's another case. It's going to distract the jury with other cases. Well, with the Vidino, he didn't say, I interviewed this person and I found X, Y, and Z, and then I talked to this other person and these were her characteristics. He didn't go into, he just said, there is no stereotype of who this person is, and what you wanted to do is not just introduce that there could be a mistake with fingerprints, which you got in on cross, but in that particular case, using different agents, they had made a mistake, and it would have required some background into those individual characteristics of what happened in that case. So are those different situations, or how would you harmonize just a general opinion, no stereotype of a terrorist, as opposed to going into the specifics of a case and talking about what happened there, what was wrong there? I think, Your Honor, that the, what was supposedly a no-profile testimony about Vidino became a profile testimony, in that now the court's question, could a clean-cut kid, as apparently Mr. Alferec looked like to the jury, become a terrorist? The answer is, according to our profiles, a clean-cut kid can be a terrorist. So indeed, these other cases informed this profile, which was presented to the jury, don't worry about that. This defendant could be a terrorist, as much of the other evidence in the case was about could-bes. Could be this, could be that, could be his hair, could be his handwriting. No definite opinions, but a lot of could-bes. Here, with the Mayfield report, which the water, which the FBI itself in the report said is a watershed case, the first time that two people, Mayfield and the actual bomber in the Madrid bombing case, shared at least ten points of characteristics, at least the experts thought so, for many, many months, until finally the FBI withdrew the Mayfield identification. But for many, many months, contrary to everything that the juries have heard since their childhoods, my childhood, I think the court's as well, fingerprints don't lie. Well, here were two people with the same fingerprints, according to the FBI and according to the Spanish authorities. In fact, Your Honors, the FBI met with the Spanish authorities and were not convinced at first that their conclusion was wrong. It was important, absolutely important for the jury to know this if there was going to be any substance to a cross-examination of a fingerprint expert. In fact, the perceptions are so strong that this court in the case of Farhane said that it was plausible for a prosecutor to use a Batson challenge against a juror who watched a lot of television, forensic science detective shows, it was okay to excuse that juror because he was going to expect infallibility, infallible scientific testimony in the case. The American Association for the Advancement of Science has repeatedly said that the public perception has been shaped by decades of overstatement by fingerprint experts. Most people think fingerprints are infallible. The FBI itself said that fingerprints are the gold standard of forensic science. Absolute certainty. Now, what about the significance of that? The government cites the case of the United States against Mitchell, pardon me, in the Seventh Circuit, a case in which there was a full-blown attempt by the defense in that case to make a judgment that fingerprints shouldn't be admitted as such. The conclusion in the case was, well, most factors don't disfavor the admission of fingerprints. However, in that case, which was handed down before the Mayfield report, there were no false positives. The court held nobody's ever heard of a false positive in fingerprints. And that was the conclusion in Mitchell. Are you aware of a district court that in the context of a trial or even in the context of a trial proceeding has permitted the defense to either refer to or try to deal with the Mayfield report? There are two circuit opinions, one in the Seventh Circuit, both in the Seventh Circuit, actually, which have upheld the preclusion of the Mayfield report. But in one of them called Rivas, defense counsel was allowed to address all of the mistakes and the problems that the Mayfield report brought up, but the preclusion was about the Mayfield report itself. There's another one in the Seventh Circuit called Bonds from 2019, actually. But they haven't had — that court didn't have the advantage of the American Association for the Advancement of Science's recent report in 2017 based on Mayfield concluding, finally, fingerprints are not science, plain and simple, that there's no scientific basis for concluding that two people can't have the same fingerprints. Thanks very much, Mr. — So in this — what was the significance — I did thank you as a way of wrapping up your oral argument. No, it's fine, it's fine. So this is the time to take the break, then? Well, we'll hear to opposing counsel, and then we'll hear your motion for a meeting in camera. Can I have some rebuttal to them? Yes, sure. You've reserved some time. May it please the Court, my name is Richard Tucker. I'm an assistant United States attorney in the Eastern District of New York. I also represented the government at trial in this matter. I think the Court has anticipated my two responses on these two tenuously related issues, dealing first with the fingerprint evidence. I think it's important to note just from the outset that the Mayfield case, which, as Your Honor noted, involved different FBI personnel and very different facts, including — and this is the point I want to make — in that particular instance in the Mayfield case, there was a single fingerprint match. And in this instance, the government induced at trial evidence that there were 18 fingerprint matches. That is, fingerprints from FIREC. In the incident case? Yes, Your Honor, on the brown packing tape that was recovered from the unexploded vehicle-borne improvised explosive device that was used to attack Forward Operating Base Chapman. As I think the argument itself illustrated, it takes a substantial amount of time to even explain the facts of the Mayfield case. And in a case like this, where the defendant's conduct spanned continents and more than almost a decade, Judge Kogan correctly ruled that allowing this fingerprint frolic into a completely unrelated case was going to run the risk of potentially confusing the jury and the complicated facts before it. Now, that said, Judge Kogan was careful to permit defense counsel to pursue the substantive lines of cross-examination that I think Mr. Stern has articulated here today. And the theme throughout much of the defense in this case was one of subjectivity. That theme was throughout the cross-examination of the fingerprint evidence and continued through the closing argument. The idea that mistakes could happen was elicited, and the fingerprint expert did not contest that, that there was an element of subjectivity in her process. She explained her process in detail, and she acknowledged that mistakes could happen. There's absolutely no basis to overturn Judge Kogan's ruling that precluded defense counsel from pursuing this totally unrelated constellation of facts involving different people with a significantly smaller quantity of evidence. Just because Dr. Vedino's testimony was raised, I'd like to address that briefly. And Your Honor, again, anticipated my points. Dr. Vedino's testimony, the vast majority of it, related to questions about the history of the facilities by which individuals traveled to those facilities. The discussion about whether there was a specific profile for an individual who could radicalize was at the very conclusion of his direct examination. It was really not a core part of what his testimony involved. And also, as Your Honor identified, and just so everyone's clear, there was absolutely no discussion of other terrorists that Dr. Vedino had interviewed specifically by names or the nature of their conduct. And Judge Kogan, again, was extremely careful, both with respect to Dr. Vedino and with respect to the testimony of our other witnesses, to make certain that we stayed focused as much as we could on the facts involving this case, again, to avoid undue delay and complicating what was already a factually rigorous case. So I think the analogy fails here. I do not believe that the idea of allowing this one bit of testimony from Dr. Vedino which, as Judge Kogan noted, had some probative impact and almost no prejudicial effect, is in any way comparable to the Court's ruling excluding this completely unrelated incident with different people and a different quantum of proof. Obviously, there were other issues raised in my adversary's brief. I'm happy to address any of those other issues if the Court has questions. But otherwise, I will sit down. Thanks very much. Thank you, Your Honor. I understand that the government and their friends on the other side have a joint motion for argument in the roving room. And based on our earlier discussion of the matter, which is part of the record, the Court is prepared to grant that joint motion, and we will repair to You want a rebuttal? Yes. I'm sorry. Yes, Mr. Sotomayor. I'm sorry. You did want a bit of time to reply. Your Honor, the fingerprint expert was able to testify without challenge that fingerprint experts, the fingerprint examination is accurate and reliable. Who should have challenged it? The defense was attempting to challenge it. I see. Well, you got to cross-examine. Pardon? You got to cross-examine. Yes, but not with the ability to show that, according to Mayfield, that's not true. It seems like what you got through the cross-examination was an acknowledgment that fingerprint analysis is imperfect. No, that fingerprint examiners make mistakes. But she also presented herself, and five times it was referred to, she referred to herself as a forensic scientist. Five times in the record she introduced herself, she was questioned as a forensic scientist, when Mayfield and its progeny say there's no science to it because there's no evidence that, in fact, two people don't share the same fingerprints. She was able to say that she made a side-by-side comparison of Mayfield's print with the latent prints when, in fact, that's the very thing that the Mayfield report criticized the FBI for doing. It's a confirmation bias when the suspect's print is compared to the latent. She was able to say that the ten-point comparison is a legitimate basis when Mayfield said ten-point comparison in both cases didn't sufficiently identify the prints. She was able to say that no two people have the same print, which Mayfield itself said it's extraordinarily rare, but it happened in this case, that as far as our analysis, two people did have the same print, at least until they finally said no. Research has shown, she said, that this is accurate and reliable evidence, but the National Association, the American Association, they all say there's no reason to believe that at all, but we were precluded from bringing that to the jury. She was able to say that her findings was an identification. She made an identification that two friction ridge prints originated from the same source. That should not be said, says the American Association for the Advancement of Science. All of these things were precluded because we couldn't show the very report from which this extraordinary, as the FBI itself said, extraordinary evidence, watershed evidence of how fingerprints are not scientific and the jury shouldn't be infallible. Thank you very much, Mr. Steering. Now, I want the record to reflect also in connection with the oral argument, which we will hear momentarily in the cloakroom, that we have a letter of December 9, 2019, on the letterhead of Mr. Boyle, who, of course, is present with us today, but signed in by Mr. Boyle and Mr. Stern, and that's part of our record. So let us recess briefly, and we'll return to open court as quickly as appropriate. Mr. Tucker, please. This court in Alcantara set forth the requirements that the court needs, the findings the court must make to properly seal a district court. I presume those rules would apply here. Your Honor will tell me if I'm presuming them. Yes, indeed. And this is a joint motion, and I think we're in agreement that all of the factors in question are part of the record and that we are in agreement that they have been met. But if you want to restate them for the record, we're delighted to hear them. I appreciate that, Your Honor, and I think I can do so succinctly. The court must find that there is a substantial probability that the public argument would prejudice a compelling interest of the government, the parties, or a third party. That's the factual point that I want to make. In our sealed – in the Tucker affidavit, which is part of the court's sealed appendix at pages sealed 5 and 6, we identify that individuals in similar circumstances as the witness in the deposition have been in danger and their family members have been in danger in the past if the fact of their cooperation was made known. I also will just make a note for the record that certain techniques employed here are potentially sensitive, and there is a compelling U.S. government interest to avoid those becoming public. I believe that there is no reasonable alternative to closure in this matter, given the dynamic nature of oral argument and the importance that appellants' counsel have the ability to answer Your Honor's questions. I believe that we have devised a narrowly tailored approach to this inasmuch as we've had some oral argument in open court already, and I would submit that the prejudice is overriding of the qualified First Amendment right to access. So I think if Your Honor agrees with those propositions of fact, then I think the record is more than adequate. I believe the members of the court do agree, and it is the case, is it not, that you have asserted the state secret doctrine. Thank you. Anything else to be put on the record? Mr. Boyle? Mr. Stern? Thank you very much. The court is in recess until we're reconvened as quickly as possible. Thank you.